UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------
SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    -against-

RALPH R. CIOFFI and
MATTHEW M. TANNIN,

                Defendants.
-------------------------------------------------------

**MEMORANDUM**
Case No. 08-CV-2457 (FB) (VVP)

*Appearances*:
*For the Plaintiff*:
JOHN D. WORLAND, ESQ.
ERICA Y. WILLIAMS, ESQ.
JOHN BOWERS, ESQ.
RICHARD HONG, ESQ.
Securities and Exchange Commission
100 F Street Northeast
Washington, DC 20549

*For Defendant Cioffi*:
EDWARD J.M. LITTLE, ESQ.
JASON ANDREW MASIMORE, ESQ.
JOHN THOMAS MCGOEY, ESQ.
KATHERIN REBECCA VOGEL, ESQ.
LISA ANN CAHILL, ESQ.
Hughes Hubbard & Reed, LLP
One Battery Park Plaza
New York, NY 10004

*For Defendant Tannin:*
SUSAN E. BRUNE, ESQ.
NINA M. BEATTIE, ESQ.
MARYANN J. SUNG, ESQ.
THERESA TRZASKOMA, ESQ.
One Battery Park Plaza, 34th Floor
New York, NY 10004

LAURIE EDELSTEIN, ESQ.
Brune & Richard LLP
235 Montgomery Street, Suite 1130
San Francisco, CA 94104

**BLOCK, Senior District Judge:**

        The parties to this civil enforcement action have negotiated a settlement.

Because the settlement contemplates the entry of consent judgments, it requires the Court's approval. *See Barcia v. Sitkin*, 367 F.3d 87, 90 (2d Cir. 2004) ("[A] consent decree (or consent judgment) is an agreement of the parties entered upon the record with the sanction and approval of the court." (citation and internal quotation marks omitted)).

Many in the financial world believe that the recent economic crisis was triggered by the collapse in 2007 of Bear Stearns and, in particular, the roughly $1.6 billion in losses suffered by two of its hedge funds.[1] On June 18, 2008, the government indicted the funds' two managers, Ralph Cioffi and Matthew Tannin, on charges of securities fraud and wire fraud. Basically, the indictment centered on their alleged misrepresentations as to the health of the funds when they knew that the funds were on their last legs. On the same date, the Securities and Exchange Commission ("SEC") brought this civil enforcement proceeding to, *inter alia,* recover monetary damages.

After a lengthy jury trial, Cioffi and Tannin were acquitted on November 10, 2009, of all criminal charges. The SEC then advised the Court that it wished to press forward on its civil suit, and the Court set the case down for trial to begin in February 2012. Just weeks before the trial was to start, the parties advised the Court of the settlement. On February 13, 2012, they presented the terms of the settlement in open court

---

[1]The complaint alleges that the collapse of the funds "caus[ed] investor losses of approximately $1.8 billion." Compl. ¶ 1. In the financial press, loss estimates fell in the $1.5-$1.6 billion range. *See* Gretchen Morgenson, *Bear Stearns Says Battered Hedge Funds Are Worth Little*, N.Y. Times, July 18, 2007, at C2 ($1.5 billion); Alistair Barr, *Bear Seizes Assets of Its High-Grade Hedge Fund*, MarketWatch, July 26, 2007, *available at* http://articles.marketwatch.com/2007-07-26/news/30723576_1_bear-funds-leveraged-fund-bear-stearns-cos ($1.6 billion). This memorandum uses the $1.6 billion estimate.

2

for the Court's approval. At that time, the Court characterized the money that the defendants would be paying to the SEC - $800,000 by Cioffi; $250,000 by Tannin - as "chump change" in light of the $1.6 billion in losses to the funds' investors, and asked the parties to submit letter briefs as to the reasons why the Court should approve the settlement. Those briefs were filed on February 21, 2012.

Having carefully reviewed the parties' submissions the court is constrained to accept the settlement. In doing so it notes the limited powers that Congress has afforded the SEC to recoup investor losses – as well as obstacles that it has placed in the path of litigation by the private bar – and invites Congress to consider whether more should be done by the government to come to the aid of the victims of Wall Street predators.

**I**

It is useful to first recount the events that led to the demise of Bear Stearns and the so-called collapse of the financial markets. As 2005 drew to a close, the 15-year bubble in the U.S. housing market finally burst. As home values fell, defaults on home loans increased, as did foreclosures of the mortgages securing the loans. As they continued to fall, lenders found themselves holding bigger and bigger piles of worthless debt.

The effect was particularly dramatic in the subprime mortgage market, in which banks and mortgage companies offered financing to higher-risk borrowers in exchange for the reward of higher interest rates. By 2007, major subprime lenders were posting huge losses. Some companies put themselves up for sale for pennies on the dollar; others simply went out of business altogether.

3

The widespread failure of banks and mortgage companies would have been bad enough, but the crisis soon spread to the entire financial sector. Lenders had long leveraged their debt holdings as collateral for bond issues and other securities. By the late 1990s, enterprising individuals were taking the practice to new levels, bundling hundreds or thousands of individual debts, cutting them up into slices (or "tranches") of various risk levels, and offering them to the investing public. These collateralized-debt obligations ("CDOs") became cash cows for several major Wall Street houses, including Merrill Lynch, Goldman Sachs, Lehman Brothers, Morgan Stanley and Bear Stearns. Although CDOs could be structured around many types of debt, mortgage-backed securities ("MBSs") were a particular favorite. By one estimate, well over $1 *trillion* in MBSs were issued by the private sector in 2006 alone; almost half of those were backed, at least in part, by subprime mortgages. *See* Office of Federal Housing Enterprise Oversight, Mortgage Market Note 08-3: A Primer on the Secondary Mortgage Market 3-4 (July 21, 2008), *available at* http://www.fhfa.gov/webfiles/1242/MMNOTE083.pdf.[2]

---

[2]Entities such as Ginnie Mae, Fannie Mae and Freddie Mac issued another $1 trillion of MBSs in 2006. *See* Office of Federal Housing Enterprise Oversight, Mortgage Market Note 08-3: A Primer on the Secondary Mortgage Market 3 (July 21, 2008), *available at* http://www.fhfa.gov/webfiles/1242/MMNOTE083.pdf. Because those securities carried government guarantees, the effect of the subprime crisis on them was borne by taxpayers instead of private investors. *See* Gretchen Morgenson, *Mortgage Giants Leave Legal Bills to the Taxpayers*, N.Y. Times, Jan. 24, 2011, at A1 ("Since Fannie Mae and Freddie Mac were taken over by the government in September 2008, their losses stemming from bad loans have mounted, totaling about $150 billion in a recent reckoning."); David Streitfled & Louise Story, *F.H.A. Problems Raising Concerns of Policy Makers*, N.Y. Times, Oct. 9, 2009, at A1 ("[T]he taxpayer is responsible for paying investors who own Ginnie Mae bonds when F.H.A.-backed mortgages hit trouble.").

The complexity of MBSs and CDOs made it difficult for anyone, including the industry's bond-rating agencies, to quickly and accurately determine the status of their collateral. But as the sheer volume of mortgage defaults and foreclosures grew, it became apparent that the toxicity of the underlying debt was infecting the securities it backed. The cash cows had become diseased.

The effect on issuers was swift and catastrophic. Goldman Sachs and Morgan Stanley saved themselves by accepting federal bailout funds, in exchange for which they agreed to become traditional banks. *See* Andrew Ross Sorkin & Vikas Bajaj, *Radical Shift for Goldman and Morgan*, N.Y. Times, Sept. 22, 2008, at A1 ("Goldman Sachs and Morgan Stanley, the last big independent investment banks on Wall Street, will transform themselves into bank holding companies subject to far greater regulation[.]"). Lehman Brothers declared bankruptcy – the largest in U.S. history. The last two players, Merrill Lynch and Bear Stearns, were sold at bargain prices to other entities. By September 2008, the era of the Wall Street investment bank had came to an end. The echoes of the collapse resonate to this day.

II

In Bear Stearns's case, the collapse was largely attributed to the two hedge funds managed by Cioffi and Tannin under the aegis of one of its subsidiaries. Heavily invested in subprime-backed securities, the funds were also highly leveraged, having used their holdings to borrow hundreds of millions of dollars with which to buy more CDOs. By 2006 the funds had collectively attracted more than $1.6 billion in investments. Even

after servicing their debts, they were able to pay exceptional returns of 1% to 1.5% per month.

The funds posted their first losses in early 2007. By the end of May, their investors were clamoring to redeem their investments, while their creditors were threatening to seize their collateral. The resulting cash crunch forced Bear Stearns to halt redemptions on June 7, 2007, and to inject $1.6 billion of its own money into the funds two weeks later.

Those measures bought the funds less than a month. On July 17, 2007, Bear Stearns announced that the seizure and forced sale of increasingly worthless assets had left "effectively no value" in one of the funds and "very little value" in the other. *Accountancy: Bearing It All*, Economist, July 21, 2007, at 41. In the end, the announcement proved to be optimistic. Both funds filed for bankruptcy protection on August 1st. One hundred percent of the $1.6 billion in investor equity was wiped out.

By the time the dust settled, Bear Stearns was moribund. Attention shifted to Cioffi and Tannin, and the criminal and civil proceedings were initiated.

The crux of the civil settlement is that the defendants, without admitting or denying the SEC's allegations, have agreed to the entry of consent judgments against them. Those judgments would

- enjoin both defendants "from violating Section 17(a)(2) of the Securities Act of 1933 [15 U.S.C. § 77q(a)(2)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly[,] to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of

6

> the circumstances under which they were made, not misleading";

- require Cioffi to pay $700,000 and Tannin to pay $200,000 in disgorgement; and

- require Cioffi to pay $100,000 and Tannin to pay $50,000 in monetary penalties.

The defendants have further consented to administrative orders barring them from participation in the securities industry for three years (for Cioffi) and two years (for Tannin).

Both sides take the position that the Court should enter the consent judgments because it owes substantial deference to the parties' agreed-upon assessment of what constitutes a fair, reasonable and adequate compromise of the SEC's claims.

### III

The SEC has broad authority to investigate possible violations of the securities laws. *See* 15 U.S.C. §§ 77t(a), 78u(a).[3] Violations can be addressed through a number of mechanisms, all of which were used or are contemplated with respect to Cioffi and Tannin.

**A. Criminal Prosecutions and Civil Injunctions**

If the SEC finds evidence of a violation, it "may transmit such evidence as may be available . . . to the Attorney General who may, in his discretion, institute the

---

[3]Statutory grants of authority to the SEC tend to appear in pairs, one stemming from the Securities Act of 1933 ("the '33 Act"), ch. 38, tit. I, 48 Stat. 74 (codified, as amended, at 15 U.S.C. §§ 77a-77aa), and the other stemming from the Securities Exchange Act of 1934 ("the '34 Act"), ch. 404, 48 Stat. 881 (codified, as amended, at 15 U.S.C. §§ 78a-78pp).

7

necessary criminal proceedings." 15 U.S.C. §§ 77t(b), 78u(d)(1); *see also* 15 U.S.C. §§ 77x (establishing criminal penalties for violations of the '33 Act), 78ff (establishing criminal penalties for violations of the '34 Act). It may also bring a civil enforcement action on its own behalf. As discussed in Part C, *infra*, the SEC's civil enforcement authority has expanded somewhat over the years, but its original authority was simply to seek injunctions against "any acts or practices which constitute or will constitute a violation of [the securities laws.]" 15 U.S.C. §§ 77t(b), 78u(d)(1). The district courts were concomitantly given jurisdiction over "all suits in equity and actions at law" to remedy such violations. *See* 15 U.S.C. §§ 77v(a), 78aa(a).

**B. Administrative Bar Orders**

The SEC derives additional enforcement authority from its role as the regulator of securities brokers and dealers. As such, it can issue administrative orders to anyone who is, or is associated with, a broker or dealer. Those orders may, among other things, "bar any such person from being associated with a broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization, or from participating in an offering of penny stock." 15 U.S.C. § 78o(b)(6)(A).

By statute, a bar order must be predicated on one of three things. First, the SEC may simply determine, in the context of an administrative proceeding, that the person has willfully violated the securities laws, aided and abetted a violation, or made a false or misleading statement to the SEC. *See id.* § 78o(6)(A)(i). The other two predicates allow the

8

SEC to rely on a prior court proceeding resulting in either a conviction of a securities law violation (or other specified crime), *see id.* § 78o(6)(A)(ii), or an injunction against holding certain positions, or engaging in "any conduct or practice," in connection with the purchase or sale of securities. *See id.* § 78o(6)(A)(iii). In all cases, the predicate must be established "on the record after notice and opportunity for a hearing," and the SEC must find that the order "is in the public interest." *Id.* § 78o(6)(A).

## C. Disgorgement and Monetary Penalties

As noted, the SEC's civil enforcement authority was initially limited to seeking injunctions against securities law violations. In 1971, however, the Second Circuit held that the statutory grants of equity jurisdiction to the district courts allowed the SEC to seek "other than injunctive relief in order to effectuate the purposes of the Act, so long as such relief is remedial relief and is not a penalty assessment." *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971). In particular, it approved an order requiring insiders to disgorge profits they had made by trading on nonpublic information as "an ancillary remedy in the exercise of the courts' general equity powers to afford complete relief." *Id.* at 1307. Other courts followed suit, *see, e.g., SEC v. Blanvin*, 760 F.2d 706, 713 (6th Cir. 1985); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989), and disgorgement of ill-gotten gains is now securely within the SEC's enforcement arsenal. *See SEC v. Cavanagh*, 445 F.3d 105, 120 (2d Cir. 2006) (tracing disgorgement's pedigree as an equitable remedy).

The next addition to the SEC's enforcement powers was the authority to ask

9

a district court to impose monetary penalties. That authority came in 1984 with respect to insider trading, *see* Insider Trading Sanctions Act of 1984, Pub. L. 98-376, 98 Stat. 1264, and in 1990 for all other securities violations, *see* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. 101-429, 104 Stat. 931.

The monetary penalties authorized vary in magnitude — from $5,000 to $100,000 for individual defendants, and from $50,000 to $500,000 for entity defendants — depending on the nature of the violation. *See* 15 U.S.C. § 78u (d)(3)(B). In addition, the maximum potential penalty may be increased to the "gross amount of pecuniary gain" realized by the defendant in any case where it exceeds the fixed penalty. *See id.*

When the SEC's counsel appeared before the Court on February 13, 2012, he represented that the agency lacks the authority to recover losses suffered by individual investors. That is true with one caveat. Disgorgement can be used as a restitutionary remedy by the creation of a "Fair Fund" from which victims can be paid. *See SEC v. Fischbach Corp.*, 133 F.3d 170, 176 (2d Cir. 1997). The Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745, expanded that remedy by allowing the SEC to add monetary penalties to a Fair Fund. *See id.* § 308 (codified at 15 U.S.C. § 7246(a)). "Thus, as with disgorged profits, the SEC may now, if it chooses, use civil penalties that it sought for the purposes of deterrence to compensate injured investors." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 82 (2d Cir. 2006). But "the decision remains in the hands of the SEC whether to distribute [disgorgement and] civil penalties to victims at all." *Id.* at 83.

Nevertheless, "[t]he primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *Fischbach Corp.*, 133 F.3d at 175. Compensation of victims – such as it is – is a "distinctly secondary goal." *Id.* Congress's authorization of civil monetary penalties was likewise intended to "further the dual goals of punishment of the individual violator and deterrence of future violations." *Official Comm. of Unsecured Investors*, 467 F.3d at 81 (internal quotation marks and citations omitted). The focus on punishment and deterrence explains why disgorgement and civil monetary penalties are measured by the defendant's gains, and not by victims' losses. *See id.* ("[T]he size of a disgorgement order 'need not be tied to the losses suffered by defrauded investors.'" (quoting *Fischbach Corp.*, 133 F.3d at 176)).

When, as here, the alleged losses far exceed the defendants' alleged profits, the SEC's civil enforcement authority necessarily provides a paltry monetary remedy. That is not to say that harmed investors have no recourse. "A private right of action is implied under § 10(b)," the anti-fraud provision of the '34 Act. *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971).[4] But that remedy relies on the private bar,

---

[4]The implied right of action for securities fraud was created at a time when the Supreme Court took what Judge Easterbrook has described as a "freewheeling" approach. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 410 (7th Cir. 2007) (Easterbrook, J., dissenting). That approach was abandoned in *Cort v. Ash*, 422 U.S. 66 (1975), and the Supreme Court has refused to imply private rights of action from any other provision of the securities laws. *See, e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 576 (1979). Nevertheless, the private right of action for securities fraud survives, *see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 165 (2008), in part because Congress has acknowledged its existence by tinkering with it. *See* Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737.

rather than on a government agency, for enforcement. However, with the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737, Congress has placed obstacles in the path of such litigation. Principally, the PSLRA created heightened pleading standards, requiring complaints to:

- identify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed";

- allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"; and

- allege "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."

*Id.* § 101(b)(codified at 15 U.S.C. § 78u-4(b)(1-2), (4)). The Act also imposed an automatic stay of discovery "during the pendency of any motion to dismiss." *Id.* (codified at 15 U.S.C. § 78u-4(b)(3)).

To be sure, Congress has not been idle in its efforts to regulate the securities industry, but its efforts – such as the Sarbanes-Oxley Act and the recently enacted Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) – are, though laudatory, basically prophylactic and essentially leave it to the private bar to seek recovery for investor losses.

Investors in the funds at issue in this case have been able to recover some of their losses. One investor recovered about two-thirds of its investment through arbitration. *See RaceTrac Petroleum, Inc. v. Bear, Stearns & Co.*, FINRA-DR Case No. 07-03561. Other

private settlements have yielded, on average, a 20% recovery for large, institutional investors. Finally, investors who had not previously negotiated settlements filed court actions against Cioffi, Tannin and others. *See Navigator Capital Partners, L.P. v. Bear Stearns Asset Mgmt., Inc.*, No. 07-CV-7783 (S.D.N.Y. filed Aug. 31, 2007); *FIC, L.P. v. Bear Stearns Asset Mgmt., Inc.*, No. 07-CV-11633 (S.D.N.Y. filed Dec. 28, 2007). By virtue of the settlements in those cases, one of which is on appeal, investors may ultimately recover roughly 30% of their investments.[5]

By contrast, the SEC is confined to recovering Cioffi and Tannin's gains. The proposed settlement is based on the theory that Cioffi gained by avoiding losses of approximately $2 million by selling part of his stake in the funds prior to their collapse, while Tannin gained $750,000 he received as a retention bonus in 2007. Even assuming that a verdict against them would result in disgorgement of the full $2.75 million, plus an equal amount in penalties, the total amount the SEC could recover would amount to less than half a percent of the $1.6 billion in investor losses the defendants allegedly precipitated.

---

[5]What portion of the $1.6 billion was held by investors who have or will likely recover some of their losses is not clear. It should also be noted that these "successful" investors held stakes in the funds at the time of their collapse and were, therefore, able to bring shareholder derivative actions rather than face the hurdles imposed on securities-fraud class actions. In addition, although the source of the settlement funds is not clear, there was evidently some entity – whether an insurance company or Bear Stearns's successor-in-interest – able and willing to furnish them. These factors are not present in every case, and may have contributed to a more favorable outcome than many defrauded investors can expect. *See* Jordan Milev et al., *Recent Trends in Securities Class Action Litigation: 2011 Year-End Review* 21-27 (NERA Econ. Consulting 2011) (estimating that median recovery in settled securities-fraud class actions hovered between two and three percent of median loss from 2002-2010, and fell to 1.3% of median loss in 2011).

Little wonder that many believe that the SEC is simply not up to the task of enforcing the securities laws. *See, e.g.,* William D. Cohan, *SEC Surrender Continues with Bear Bankers Deal*, Bloomberg View, Feb. 20, 2012, *available at* http://www.bloomberg.com/news/2012-02-20/sec-surrender-goes-on-with-bear-fund-deal-commentary-by-william-d-cohan.html.

Given this sorry state of affairs, Congress may wish to consider broadening the SEC's power to recover amounts more reflective of investor losses, and to require any moneys recovered to be paid into Fair Funds for investors' benefit. It has, for example, empowered the Commodities Futures Trading Commission – the agency overseeing commodities trading – to assess "actual damages caused by [a] violation [of the commodities laws]," and, in cases of "willful and intentional" violations, punitive damages "equal to no more than two times the amount of such actual damages." 7 U.S.C. § 18(a). Given the obvious parallels between commodities trading and securities trading, Congress could easily grant the SEC the same authority.

For now, however, the Court must accept the SEC's enforcement authority as it currently stands. Regrettably, that authority leaves investors out in the cold.

IV

A. **Standard of Review**

The standard by which a court should evaluate a proposed consent judgment settling an SEC enforcement action has recently been the subject of debate in the Second Circuit. Judge Rakoff of the Southern District has, on several occasions, described the

14

standard as "whether the proposed Consent Judgment . . . is fair, reasonable, adequate, and in the public interest." *SEC v. Citigroup Global Mkts., Inc.*, ___ F. Supp. 2d ___, 2011 WL 5903733, at *2 (S.D.N.Y. Nov. 28, 2011) (quoting *SEC v. Bank of Am. Corp.*, 653 F. Supp. 2d 507, 508 (S.D.N.Y. 2009); *see also SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304 (S.D.N.Y. 2011). With respect to the first three factors, courts have held that a "presumption of fairness, adequacy, and reasonableness may attach to a . . . settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (discussing judicial approval of class-action settlements; citation and internal quotation marks omitted). The fourth factor — "the public interest" – is not always explicitly included in formulations of the standard. *See, e.g., SEC v. Wang*, 944 F.2d 80, 84 (2d Cir. 1991) ("[O]nce the district court satisfies itself that the distribution of proceeds in a proposed SEC disgorgement plan is fair and reasonable, its review is at an end.").

Notwithstanding the general rules favoring judicial approval of negotiated settlements, Judge Rakoff believes that a more searching inquiry is appropriate in SEC enforcement actions because the typical settlement in such cases "has aspects of a judicial decree," *Bank of Am.*, 653 F. Supp. 2d. at 508, and, in particular, imposes injunctive relief, which "a court cannot grant . . . without considering the public interest." *Citigroup*, ___ F. Supp. 2d. at ___, 2011 WL 5903733, at *2. Applying that philosophy, Judge Rakoff concluded that the proposed settlement presented to him in *Citigroup* "serve[d] various narrow interests of the parties," but not the public interest, because it did not require the

15

defendants to admit liability. *Id.* at *5. He further opined that the $285 million in disgorgement and penalties was "pocket change to any entity as large as Citigroup," and criticized the lack of any guarantee that even that amount would go to investors who had suffered losses. *Id.* For those reasons, he refused to approve the settlement and directed the parties to prepare for trial. *See id.* at *6.

Both parties appealed and sought a stay from the Second Circuit, which was recently granted. *See SEC v. Citigroup Global Mkts., Inc.*, 673 F.3d 158 (2d Cir. 2012). Although the circuit court was careful to note that it was passing only on the *likelihood* of success on appeal, *see id.* at 161, its reasoning was not equivocal in many respects.

First, it questioned whether the stated reason for invoking the public interest – the inclusion of injunctive relief – justified Judge Rakoff's inquiry into the absence of an admission of liability. *See id.* at 163 n.1. It then faulted Judge Rakoff for not deferring to the SEC's assessment of the public interest:

> The S.E.C.'s decision to settle with Citigroup was driven by considerations of governmental policy as to the public interest. The district court believed it was a bad policy, which disserved the public interest, for the S.E.C. to allow Citigroup to settle on terms that did not establish its liability. It is not, however, the proper function of federal courts to dictate policy to executive administrative agencies . . . . While we are not certain we would go so far as to hold that under no circumstances may courts review an agency decision to settle, the scope of a court's authority to second-guess an agency's discretionary and policy-based decision to settle is at best minimal.

*Id.* at 163-64.

In a similar vein, Judge Rakoff's analysis did not, in the circuit court's view,

give adequate deference to the defendant's assessment of its own interests. It questioned "whether it is a proper part of the court's legitimate concern to protect a private, sophisticated, counseled litigant from a settlement to which it freely consents." *Id.* at 165. It "doubt[ed] that a court's discretion extends to refusing to allow such a litigant to reach a voluntary settlement in which it gives up things of value without admitting liability." *Id.*

The Second Circuit also identified other problems with Judge Rakoff's inquiry. It noted, for example, that insisting on an admission of liability "prejudge[d] the fact that Citigroup had in fact misled investors, and assume[d] that the S.E.C. would succeed at trial in proving Citigroup's liability." *Id.* at 163. Such prejudgments ignored "[t]he numerous factors that affect a litigant's decision whether to compromise a case or litigate it to the end," including "the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt." *Id.* at 164. Indeed, the circuit court opined, "[r]equiring such an admission would in most cases undermine any chance for compromise." *Id.* at 165.

## B. Application

As an initial matter, the Court previously voiced its distaste for injunctions that say nothing more than, "Don't violate the law." Tr. of Feb. 13, 2012, at 11. Armed with a better understanding of the enforcement process, however, the Court accepts that the injunctions will serve as a necessary predicate for the administrative bar orders.

17

As for the monetary aspects of the settlement, the Court need not await the Second Circuit's final pronouncement in *Citigroup*. If its role is to be confined to an assessment of whether the settlement is the product of arm's length negotiation between sophisticated parties with capable counsel and adequate knowledge of the facts adduced in discovery, the proposed consent judgments pass muster. There is no evidence of either collusion or coercion.

Even if the public interest is considered, the SEC has adequately taken that interest into account in light of its limited authority and the facts of the case. In that latter regard, the foremost consideration is the uncertainties surrounding a trial. In light of the acquittals in the criminal case, the SEC reasonably opted to pursue settlement as the safest means of protecting the public interest. The acquittals did not, however, completely foreclose the possibility that the SEC could satisfy the lesser burden of proof applicable to a civil enforcement action. *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355 (1943) ("Where [the] proof is offered in a civil action . . . , a preponderance of the evidence will establish the case; if it were offered in a criminal case, it would have to meet the stricter requirement of satisfying the jury beyond a reasonable doubt."). Thus, from the defendants' perspective, settlement was a reasonable means of avoiding the risk of greater liability.

In the final analysis, with loss recovery out of the picture, disgorgement and monetary penalties must be measured against the defendants' alleged gains, which, as noted, were $2 million for Cioffi and $750,000 for Tannin. The recovery of $800,000 from

Cioffi and $250,000 from Tannin represents a sizeable percentage of the outer limits the SEC could have reasonably expected to recover from a verdict in its favor.

V

A district court is surely not required to rubber stamp every settlement between the SEC and a defendant. But its role is restricted to assessing whether the settlement is fair, reasonable and adequate within the limitations Congress has imposed on the SEC to recover investor losses. Since the Court is satisfied that that standard has been met, it will reluctantly sign the proposed consent judgments.

                                                      s/ Judge Frederic Block
                                                  _____
                                                  FREDERIC BLOCK
                                                  Senior United States District Judge

Brooklyn, New York
June 18, 2012